UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 10-21944-CIV-ALTONAGA/Simonton

**SOVEREIGN BONDS
EXCHANGE LLC**,

    Plaintiff,

vs.

**FEDERAL REPUBLIC
OF GERMANY**, *et al.*,

    Defendants.
_____/

## <u>ORDER</u>

**THIS CAUSE** comes before the Court upon Defendant, the Federal Republic of Germany's ("Germany['s]" or "FRG['s]") Motion to Dismiss . . . (the "Motion") [ECF No. 118], filed on May 13, 2011.  Germany seeks to dismiss Plaintiff, Sovereign Bonds Exchange LLC's ("Sovereign['s]") Amended Complaint [ECF No. 85] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The Court has carefully considered the parties' written submissions and  applicable law.

### I.  BACKGROUND[1]

Sovereign is the holder, owner, or has interests in certain bearer bonds, "German Provincial and Communal Banks Consolidated Agricultural Loan (Secured Sinking Fund Gold Bond Series A 6 & ½ % Dated June 1928 – Due June 1, 1958" (the "Provincial Bonds").  This suit seeks payment on those bonds.

---

[1] The allegations of Plaintiff's Amended Complaint are taken as true for Rule 12(b)(6) purposes.

Case No. 10-21944-CIV-ALTONAGA/Simonton

### A.     The Provincial Bonds

The Provincial Bonds were issued on June 1, 1928.  (*See* Am. Compl. ¶ 17).  These bearer instruments were payable in Manhattan, Boston, and Chicago, and were listed and sold on the New York Stock Exchange.  (*See id.* ¶¶ 17, 21).  The bonds are the "obligations" of Defendants "directly, or as successors in interest to the obligations of the original debtors."  (*Id.* ¶ 22).

The Amended Complaint explains that the Provincial Bonds "were issued as part of a German national program for improving agricultural conditions."  (*Id.* ¶ 18).  The underlying loans were contracted for by 14 "provincial and communal banks."  (*Id.* ¶ 20).  The Provincial Bonds had a 30-year term and paid interest twice a year — annually on June 1 and December 1 — at a rate of 6½ percent per annum.  (*See id.* ¶ 21).

When the Provincial Bonds were issued, "each German provincial and communal bank was owned in whole or in part by a German province and each province was legally responsible for all obligations of its bank."  (*Id.* ¶ 23).  Obligors included: the former State of Prussia (Preußen Provinz), the former State of East Prussia (OstPreußen Provinz), the former State of Posen-West Prussia (Grenzmark Prossen – Westpreußen Provinz), the former State of Pomerania (Pommern Provinz), the former State of Mecklenburg-Western Pomerania (Mecklenberg-Vorpommern Provinz), the former State of Silesia (Schleisen Provinz), the former State of Upper Silesia (OberSchlesien Provinz), the former State of Lower Silesia (NiederSchlesien Provinz), the former State of Saxony (Sachsische Provinz), the former German Democratic Republic (East Germany), as well as Defendants and their predecessors.  (*See id.* ¶ 24).  The Provincial Bonds' proceeds were then divided among the various banks.  (*See id.* ¶ 25).

Case No. 10-21944-CIV-ALTONAGA/Simonton

In 1933, the German government stopped paying on the Provincial Bonds. (*See id.* ¶ 19). Then, following World War II ("WWII"), West Germany entered into an agreement with the Allies whereby West Germany assumed the prewar debt liability of the German Reich. (*See id.* ¶ 44). Included in that assumption of debt were the unpaid obligations from certain Provincial Bonds. (*See id.*).

Despite this assumption of debt, following WWII the majority of the Provincial-Bonds' obligor banks were located in East Germany or Poland, and not West Germany. (*See id.* ¶ 34). These East German and Polish obligors, comprising 64.5% of obligors, include Landesbank Der Provinz Ostpreussen, Provinzialbank Pommern, ProvinzialHilfskasse Fur Die Provinz Niederschlesien, Brandenburgische Provinzialbank Und Giro-Zentrale, Sachsische Provinzialbank Und Giro-Zentrale, Provinzialbank Oberschlesien, and Provinzialbank Grenzmark Posen-Westpruessen Giro Zentrale. (*See id.* ¶¶ 26–34). As a result, "no opportunity for payment of the outstanding principal and interest on the [Provincial] Bonds or demand therefor could be made." (*Id.* ¶ 34). Furthermore, because 64.5% of obligors were located outside of West Germany,[2] the Provincial Bonds were not subject to the same validation requirements as were fully West German bonds, but were rather controlled by Article 25 of the London Debt Agreement, and Defendants' obligations did not arise until reunification in 1990. (*See id.* ¶¶ 54, 58).

Sovereign holds, owns, or has an interest in a number of Provincial Bonds of mixed origin.

---

[2] These "64.5% of [] Bonds issued by Prussian banks located in territory that became East Germany," *Mortimer Off Shore Servs., Ltd. v. Fed. Rep. of Ger.*, 615 F.3d 97, 109 (2d Cir. 2010), are referred to as "East German Bonds." The other "35.5% [] which were issued in what later became West Germany," *id.* at 106, are referred to as "West German Bonds."

3

Case No. 10-21944-CIV-ALTONAGA/Simonton

(*See id.* ¶¶ 2, 35). As a holder of bearer instruments that "have not been canceled, perforated, voided, or otherwise modified," it is entitled to payment "upon demand." (*Id.* ¶¶ 35–36). That payment is estimated to be in excess of $100 million. (*See id.* ¶ 39).

In seeking payment, Plaintiff made timely demand on Defendants. (*See id.* ¶ 41). Further, according to Plaintiff, all "pre-conditions for payment" have been either satisfied or waived. (*Id.* ¶ 66). Nonetheless, Defendants "failed or refused to make payment for the [Provincial] Bonds . . . ." (*Id.* ¶¶ 42, 63). Instead of paying, they "erroneously" claim Plaintiff's bonds "were among those bonds allegedly misappropriated by invading Russian forces at the end of World War II and forming part of a so-called 'stolen bonds list' . . . ." (*Id.* ¶ 42).

In response to Defendants' nonpayment, Plaintiff asserts a single claim that Defendants have, by refusing to pay on the bonds, breached their contracts with Plaintiff. (*See id.* ¶¶ 67–74). Germany now moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Mot.).

    **B.**    **The London Debt Agreement and Other Laws**

Following WWII, to help establish "normal commercial relationships," West Germany committed to paying its prewar liabilities. *World Holdings, LLC v. Fed. Rep. of Ger.*, No. 08–20198–CIV, 2011 WL 2217495, at *3 (S.D. Fla. June 5, 2011). To restore confidence in its economy and normalize economic and financial relations with other countries, West Germany, the United States, and 15 other countries signed the Agreement on German External Debts ("London Debt Agreement" or "LDA") in 1953,[3] which resulted in a proposed settlement of most of

---

[3] Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, T.I.A.S. No. 2792, 1953 WL 44333 (1953) [hereinafter"LDA"].

Case No. 10-21944-CIV-ALTONAGA/Simonton

Germany's prewar debts, including the bonds. *See id.*

At the time of signing, the LDA applied only to bonds of West German origin. (*See* Am. Compl. ¶¶ 44–58). Because of Germany's division into East and West Germany following WWII, and the resulting split of Provinces, States, and Provincial Banks, certain bond obligors were located in different Germanies and other formerly German-occupied East European countries. (*See id.* ¶ 48). Accordingly, the LDA included a clause permitting Defendants to "defer" payment on certain bonds. (*Id.* ¶ 49). One of the bond series that Defendants delayed paying on was the Provincial Bonds. (*See id.* ¶ 50).

The LDA made payment on Provincial Bonds contingent on the reunification of Germany. (*See id.* ¶¶ 51, 54). Sovereign maintains the LDA only addressed "German Bonds where the Bonds were issued by Provinces or Provincial authorities or entities that were located in West Germany as of the end of World War II." (*Id.* ¶ 50). Defendants "insisted upon delaying the obligations to address Bonds for which the obligors were located in whole or in part in the territory of East Germany as of the end of World War II." (*Id.*). LDA Article 25 deferred the obligation to "redeem, honor and/or pay" for East German bonds "until such time that East Germany and West Germany reunited." (*Id.* ¶ 51).

Bondholders who accepted the LDA were subjected to additional terms and conditions, namely, a validation process. (*See id.* ¶ 52). According to Sovereign, bondholders whose bonds were issued by entities located outside of West Germany did not have to go through the validation process. (*See id.* ¶ 64).

Bondholders who did not accept the LDA are "'Non-Assenting' Bondholders." (*Id.* ¶ 53).

5

Case No. 10-21944-CIV-ALTONAGA/Simonton

"Non-Assenting Bondholders have never been able to get Defendants [Germany] and/or the responsible obligor, successor corporate entities or financial institutions to redeem, pay or honor the debts represented by the bonds, including the [Provincial] Bonds." (*Id.* ¶ 60). For them to even make a claim for their bonds, the Non-Assenting Bondholders had to wait until all bondholders who accepted the LDA were paid, and wait for the reunification of Germany. (*See id.* ¶¶ 53–57). Both of these events occurred by 1994. (*See id.* ¶¶ 57–58). Where a bondholder did not assent to the LDA, the LDA did not affect that bondholder's rights. (*See id.* ¶ 56).

Despite Germany's reunification and payment to all assenting bondholders, Sovereign contends Germany has "failed to follow the protocols and formalities of Article 25 of the LDA . . . ." (*Id.* ¶ 59). While for West German bonds — "bonds issued by banks, institutions and governmental entities in territories forming part of West Germany after World War II" — validation was required, no such validation was required of East German bonds. (*Id.* ¶¶ 61, 64). Yet when Sovereign demanded payment on its bonds, Defendants "responded . . . with the uniform response that payment cannot be made because Plaintiff's bonds are found on the 'stolen bonds' list, an assertion which is false." (*Id.* ¶ 63). Germany continues to maintain that all bonds must be validated before it will pay. (*See id.* ¶ 64). But Sovereign states Germany "never complied with the terms of the LDA and the Validation Law by creating validation boards or examining authorities within the United States to permit domestic examination and proof of the validity of such bonds." (*Id.* ¶ 64). Indeed, Sovereign contends "there is currently no existing Validation Board in any location through which bond holders can seek validation." (*Id.* ¶ 65). Thus, Sovereign asserts "all pre-conditions for payment of principal and interest . . . have been satisfied and/or waived and payment is now due and owing by Defendant

6

Case No. 10-21944-CIV-ALTONAGA/Simonton

[Germany] and Defendant Banks . . . ." (*Id.* ¶ 66).

In 1953, a series of other measures were also enacted. One of those measures was the Agreement Between the United States of America and the Federal Republic of Germany Regarding Certain Matters Arising from the Validation of German Dollar Bonds, U.S.-F.R .G., 4 U.S.T. 885, Apr. 1, 1953 (hereinafter "1953 Treaty"). Thereunder, the United States and Germany "agreed that it is in their common interest to provide for the determination of the validity of German dollar bonds in view of the possibility that a large number of such bonds may have been unlawfully acquired during hostilities in Germany or soon thereafter." *Id.* pmbl. The 1953 Treaty incorporated by reference West Germany's Validation Law. *See Abrey v. Reusch*, 153 F. Supp. 337, 339 (S.D.N.Y.1957). West Germany's Validation Law — Bundesgesetzblatt 1952 (BGBl.II) ("Validation Law") — was enacted on August 25, 1952. *See* Validation Law, BGBl.II, at 305 [ECF No. 119-1]. This law requires validation of all foreign currency bonds and other securities listed in the Validation Law. *See World Holdings*, 2011 WL 2217495, at *3. "Validation was required because purportedly a large volume of German foreign currency bonds, purchased for redemption by the Germans and held in negotiable form in Berlin, . . . found their way into unauthorized hands after the occupation of Berlin in 1945." *Id.* (citations and internal quotation marks omitted). In combination, the 1953 Treaty along with the Validation Law require that all listed West German bonds be validated before they may be enforced. *Id.* at *21–26. Sovereign's bonds are listed in the Validation Law. *See* Validation Law, BGBl.II, Annex IV, at 327.

Case No. 10-21944-CIV-ALTONAGA/Simonton

## II.  LEGAL STANDARDS

### A. Rule 12(b)(1)

A defendant may attack subject matter jurisdiction under Rule 12(b)(1) in two ways — a facial attack or a factual attack. A facial attack asserts that a plaintiff has failed to allege a basis for subject matter jurisdiction in the complaint. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). In a facial attack, the plaintiff's allegations are taken as true for the purposes of the motion, *see id.*, and the plaintiff is afforded safeguards similar to those provided in challenging a Rule 12(b)(6) motion. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

In contrast, a factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings such as testimony and affidavits, are considered." *Menchaca*, 613 F.2d at 511. In a factual attack, courts are free to weigh the evidence to satisfy themselves they have the power to hear the case. *See Lawrence*, 919 F.2d at 1529. No presumption of truth attaches to the plaintiff's allegations, and the existence of disputed material facts does not prevent the trial court from evaluating for itself the merits of the jurisdictional claim. *See id.* Moreover, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists." *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).

While the parties address these standards in their memoranda, they do not identify which of the two attacks on subject matter jurisdiction applies. The Court assumes its review is a facial one, as the only matters considered besides the pleading are matters the Court may take judicial notice of.

Case No. 10-21944-CIV-ALTONAGA/Simonton

B.      **Rule 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

### III. ANALYSIS

A.      **Subject Matter Jurisdiction**

The Court's analysis regarding subject matter jurisdiction differs based on whether the bonds arose from lands which later became the former East Germany or those that became West Germany. From 1949 through 1990, the two Germanies were separate countries, assumed different pre-WWII liabilities, and undertook separate activities, including commercial activity. *See Mortimer Off Shore*, 615 F.3d at 100–01. There is thus a different outcome depending on the origin of the bonds — the Court does not possess subject matter jurisdiction over East German bonds, but does have subject matter jurisdiction over West German bonds.

Case No. 10-21944-CIV-ALTONAGA/Simonton

### 1. The Foreign Sovereign Immunities Act of 1976

Enacted in 1976, the Foreign Sovereign Immunities Act ("FSIA") "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Rep. of Arg. v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). The FSIA "provides the sole basis for obtaining subject matter jurisdiction over a foreign sovereign in the United States." *Guevara v. Rep. of Peru*, 468 F.3d 1289, 1294 (11th Cir. 2006) (citing *Beg v. Islamic Rep. of Pak.*, 353 F.3d 1323, 1324 (11th Cir. 2003)).

Subject matter jurisdiction over claims brought against foreign states is conferred by 28 U.S.C. § 1330(a), which provides:

> The district courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).

Under the FSIA, "a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." *Hond. Aircraft Registry, Ltd. v. Gov't of Hond.*, 129 F.3d 543, 546 (11th Cir. 1997). Where an FSIA exception "is applicable, the state is subject to suit, and federal district courts have jurisdiction to adjudicate the claim." *Rep. of Iraq v. Beaty*, 129 S. Ct. 2183, 2186 (2009) (citing § 1330(a); *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 489 (1983)).

Germany is a "foreign state" within the meaning of the FSIA. *See* 28 U.S.C. § 1603(a); *Gutch v. Fed. Rep. of Ger.*, 255 F. App'x 524, 525 (D.C. Cir. 2007). Germany is therefore immune

Case No. 10-21944-CIV-ALTONAGA/Simonton

from suit unless one of the statutory exceptions applies. The exception that allegedly applies here is the commercial-activity exemption:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case —
> . . . .
>
> > (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; . . . ; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). A "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603. The Supreme Court has acknowledged this definition "leaves the critical term 'commercial' largely undefined." *Rep. of Arg.*, 504 U.S. at 612. Nevertheless, the Court has concluded that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614. The question of what constitutes commercial activity is determined not by the purpose of the actions, but by the type of actions:

> [T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

*Id.* (emphasis in original) (citations omitted). To illustrate, "issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id.* at 614–15.

### 2. East German Bonds

#### a. *Mortimer Off Shore Services v. Federal Republic of Germany*

Last year, the Second Circuit considered the breadth, if any, of U.S. courts' subject-matter jurisdiction over the same series of bonds. In *Mortimer*, the Second Circuit determined in a factually identical scenario that U.S. courts lack subject-matter jurisdiction over "German Provincial & Communal Bank Consolidated Agricultural Loan Secured Sinking Fund Gold Bonds Series A" issued by banks located in the territories that became East Germany. *Mortimer Off Shore*, 615 F.3d at 99, 108–113[4] (*see* Am. Compl. ¶ 2). After considering *Mortimer*, the Amended Complaint, and Plaintiff's and Defendants' arguments, the Court is persuaded by *Mortimer* and agrees it lacks subject matter jurisdiction over Sovereign's East German bonds.

First, Sovereign's arguments and theories of jurisdiction were all rejected by the court in *Mortimer*. (*See* Mot. Opp'n 4–11); *see also Mortimer Off Shore*, 615 F.3d at 108–13 & n.13. Second, Sovereign's own citations to *Mortimer* convince the Court that Sovereign has no meaningful

---

[4] In *Kupfer v. Federal Republic of Germany*, plaintiff sued the same defendants as Defendants here. *See* No. 07 Civ. 8589(PAC), 2011 WL 1672741, *1 (S.D.N.Y. May 2, 2011). Noting that the only defendant in *Mortimer* was Germany, the court in *Kupfer* stated, "[t]he fact that the defendant in Mortimer was [Germany] is of no moment. There is no logical reason that the Validation Law should apply any differently depending on the party from which a bondholder is seeking redemption." *Id.* at *3 n.4. The Court agrees.

Case No. 10-21944-CIV-ALTONAGA/Simonton

way of distinguishing *Mortimer*'s holding that subject matter jurisdiction is lacking, under the FSIA, over the East German bonds. *See Mortimer Off Shore*, 615 F.3d at 113. Sovereign quotes lengthy passages from *Mortimer* in an attempt to demonstrate that Germany engaged in commercial activity. (*See* Mot. Opp'n 8–9) (quoting *Mortimer*, 615 F.3d at 107–08). Sovereign, however, quotes from the portion of the *Mortimer* opinion concerning West German bonds. The Court agrees it has subject matter jurisdiction over those bonds issued from territories that later comprised West Germany. But quoting portions of *Mortimer* concerning West German bonds does not persuade the Court that it possesses subject matter jurisdiction over East German bonds.

Finally, Sovereign fails to bridge the gap between private Prussian banks and East Germany. The court in *Mortimer* determined that although Germany assumed liability for the East German debt, because East Germany had not assumed liability for Prussian-issued bonds, Germany did not assume that debt through unification alone. *See Mortimer*, 615 F.3d at 112; *see also* Fig. 1. The Second Circuit did not say Germany never did this, only that Mortimer had not presented any evidence of that assumption. Similarly here, Sovereign does not allege or otherwise show that East Germany assumed liability for Prussian-issued bonds. Consequently, the Court cannot bridge the gap left open in *Mortimer*, and arrives at the same conclusion: it lacks subject matter jurisdiction over the East-German issued bonds.[5]

---

[5] For a depiction of the gap between Prussian banks and East Germany, *see* the illustration at the end of this opinion.

Case No. 10-21944-CIV-ALTONAGA/Simonton

### 3. West Germany

#### a. *Mortimer Off Shore Services v. Federal Republic of Germany*

Regarding bonds issued in the territories that became West Germany, the court in *Mortimer* came to a different conclusion, determining the FSIA commercial-activity exception applied and the court possessed subject matter jurisdiction over the West German bonds. *See Mortimer Off Shore*, 615 F.3d at 106–08. The court in *Mortimer* determined that Germany's there-admitted assumption of liability for properly validated West German bonds was commercial and not sovereign in nature. *See id.* at 107. The Second Circuit also rejected Germany's argument that by acting solely as a transfer agent, the court lacked jurisdiction. *See id.* at 108. Instead, the court determined that private parties take on similar obligations, and this type of action constitutes commercial activity. *See id.*

#### b. *The Court has Subject Matter Jurisdiction over Sovereign's "West German" Bonds.*

As West Germany agreed to assume liability for bonds issued by banks located in the territories that became West Germany, *see* Validation Law and 1953 Treaty, it engaged in commercial activity, and the FSIA exception applies.[6] Even if Germany acted solely as a transfer agent for the West German bonds (*see* Mot. 11–12), this constitutes commercial activity, the FSIA exception applies, *see Mortimer Off Shore*, 615 F.3d at 108, and the Court has subject matter jurisdiction over the West German bonds.

---

[6] In *Mortimer*, unlike here, Germany "agreed that it had assumed liability for properly validated West German Bonds . . . ." *Mortimer Off Shore*, 615 F.3d at 107. Whether or not Germany agrees to that fact here, because Germany concedes it was, at a minimum, a transfer agent (*see* Mot. 11–12), it engaged in commercial activity, *see Mortimer Off Shore*, 615 F.3d at 108.

Case No. 10-21944-CIV-ALTONAGA/Simonton

**B.     Rule 12(b)(6)**

Having determined there exists subject matter jurisdiction over the West German bonds, the Court turns to the Rule 12(b)(6) portion of Germany's Motion. Because it is apparent that Plaintiff's bonds have not been validated, Plaintiff may not enforce them in the United States.[7] Any claims that Germany was incorrect in not validating the bonds (to the extent validation has been sought) must be raised in an "appeal (sofortige Beschwerde) to the Oberlandesgericht competent" in Germany, and not here. *World Holdings*, 2011 WL 2217495, at *30 (citing Validation Law, BGBl.II, at Arts. 21–31).

In *World Holdings*, the undersigned undertook a thorough analysis to determine if various U.S. treaties require non-assenting West German bondholders to validate their bonds. The Court determined that under the 1953 Treaty, *all* bonds subject to the Validation Law must first be validated in order to be enforceable. *See id.* at *21–26. The Provincial Bonds are subject to the Validation Law. *See* Validation Law, BGBl.II, Annex IV, at 327. Therefore, Sovereign's Provincial Bonds must first be validated in order for Plaintiff to state a claim under Rule 12(b)(6).

While the Amended Complaint attempts to skirt the validation issue, a careful reading reveals that Sovereign's Provincial Bonds have not been validated. First, Sovereign concedes that "[b]efore any bond holder could be paid for 'West German' bonds . . . he or she was required to submit the bonds to a validation procedure established under a German Validation Law . . . ." (Am. Compl. ¶ 61). Sovereign then attempts to extricate itself from the validation requirement by asserting its

---

[7] To the extent that any of Plaintiff's bonds have been validated but not paid, Plaintiff may amend its Complaint and seek to move forward with the case concerning only those bonds.

15

Case No. 10-21944-CIV-ALTONAGA/Simonton

bonds are not West German.[8] (*See id.*).[9] It states its Provincial Bonds were not issued from banks, institutions, and governmental entities in those territories that formed West Germany. (*See id.*).

Second, Sovereign acknowledges that it made "due demand for payment of principal and interest" on its Provincial Bonds. (*Id.* ¶ 63). Germany, however, responded that payment could not be made because Sovereign's bonds were on a "stolen bonds" list. (*Id.*). In other words, Sovereign's bonds were not validated, for to be validated the bonds must not have been stolen.[10] *See World Holdings*, 2011 WL 2217495, at *3 (citations omitted). Sovereign contends, however, that since its bonds are East German, they need not be validated.[11] (*See id.* ¶ 64).

Finally, it is apparent that Sovereign's bonds were not validated because it asserts it could not seek validation since "there is currently no existing Validation Board in any location through

---

[8] Sovereign is inconsistent in its description of its bonds' origins. Throughout the Amended Complaint, Sovereign insists its bonds are East German (and thus, it says, outside the validation requirement). (*See* Am. Compl. ¶¶ 54, 64). Then, in its Opposition, Sovereign cites and quotes the *Mortimer* sections referring to West German bonds. (*See* Mot. Opp'n 8–9) (quoting *Mortimer Off Shore*, 615 F.3d at 107–08). As explained, the bonds' origin is important because it determines the Court's jurisdiction. The court in *Mortimer* determined this series of bonds was issued from both West and East German territories. *See Mortimer Off Shore*, 615 F.3d at 106, 108–09.

[9] Of course, as discussed, if they are not West German, then the Court lacks subject matter jurisdiction over the bonds. Furthermore, as will be further discussed, at least one court has held that all Provincial Bonds, no matter where issued, are West German and subject to the validation requirement. *See Kupfer*, 2011 WL 1672741, at *3–4 (finding the plaintiff could not enforce his "German Provincial & Communal Bank Consolidated Agricultural Loan, Secured Sinking Fund Gold Bonds Series A" bonds because he had not complied with the Validation Law).

[10] Even if the bonds were not stolen, by Germany insisting they are, Germany has refused to validate them. The question is not whether the bonds should have been validated, it is whether they were actually validated. If validation was denied wrongfully, the remedy for that is an appeal in Germany. *See World Holdings*, 2011 WL 2217495, at *30.

[11] Again, this is a proposition which, if correct, leaves the Court without subject matter jurisdiction over the bonds.

16

Case No. 10-21944-CIV-ALTONAGA/Simonton

which bond holders can seek validation." (*Id.* ¶ 64). While this is a statement of fact that the Court must accept as true for Rule 12(b)(6) purposes, it only tells half of the story. Even if there are no *Validation Boards* where Plaintiff could validate its bonds, the Court takes judicial notice that Germany still maintains an Examining Authority for validation of all bonds — an entity that has existed since 1953 and continues to exist. *See World Holdings*, 2011 WL 2217495, at *4, 29. Thus, Plaintiff may submit its bonds to the German Examining Authority for validation.

As a result, to the extent Plaintiff's bonds are West German in origin, they must be validated. *See id.* at *21–26; *see also Mortimer Off Shore*, 615 F.3d at 117 ("In sum, a non-assenter can only enforce bonds covered by the Validation Law after complying with the validation procedures and explaining why any delay in doing so is excusable."); *Kupfer*, 2011 WL 1672741, at *3–4. Because Plaintiff's bonds have not been validated, they may not be enforced in a U.S. court, and dismissal is appropriate under Rule 12(b)(6).

Although the Court has determined it lacks subject matter jurisdiction over the bonds to the extent they are East German, even if there was subject matter jurisdiction over the bonds, there is authority that states they too must be validated. In *Kupfer*, the plaintiff sought payment on the same series of bonds as Sovereign does — "German Provincial & Communal Bank Consolidated Agricultural Loan, Secured Sinking Fund Gold Bonds Series A." *Kupfer*, 2011 WL 1672741, at *1. Citing *Mortimer Off Shore*, the court in *Kupfer* stated that the "Validation Law is still in effect and [] it applies specifically to the Agricultural Bonds at issue here." *Id.* at *3 (citing *Mortimer Off Shore*, 615 F.3d at 114–15). Citing the Validation Law, the court found that the bonds at issue were

17

Case No. 10-21944-CIV-ALTONAGA/Simonton

"clearly" West German.[12]  *Id.*  Because Kupfer had not validated his bonds, the court stated they could not be enforced and dismissed the case under Federal Rule 12(c).[13]  *See id.* at *2, 4.  As discussed, to the extent the Agricultural Bonds are West German, the Court agrees they may not be enforced unless first validated.[14]

Plaintiff is thus left with bonds that, no matter where they were issued, it cannot enforce in U.S. courts.

### IV. CONCLUSION

In the end, Sovereign cannot decide where its bonds were issued.  It describes them as East German in an attempt to avoid the validation requirement.  It also refers to them as West German so that the Court will find subject matter jurisdiction.  But each bond can only have one issuer.  If a bond is "East German," the Court lacks subject matter jurisdiction over the bond.  If a bond is "West German," it must be validated to be enforceable.  Sovereign has not alleged it validated its bonds.  Therefore, its claim must fail.

---

[12] The Court here does not undertake an in-depth analysis as to whether the Agricultural Bonds are fully West German (as *Kupfer* states) or are partially East and partially West German as per *Mortimer*.  The result – dismissal – is the same no matter how the bonds are defined.

[13] "'The same standard applicable to [Federal Rule of Civil Procedure] 12(b)(6) motions to dismiss applies to [Federal Rule of Civil Procedure] 12(c) motions for judgment on the pleadings.'" *Kupfer*, 2011 WL 1672741, at *2 (alterations in original) (quoting *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010)).

[14] The October 10, 2010 Order [ECF No. 81] declined to dismiss the breach of contract claim because plaintiff did not allege it was required to validate its bonds and it alleged timely demand for payment.  (*See* Oct. 10 Order, 10).  Thereafter, the undersigned decided *World Holdings*, finding that the Validation Law and 1953 Treaty applied to *all* West German bonds and all bonds must be validated to be enforceable.  *See World Holdings*, 2011 WL 2217495, at *21–26.  In light of the *World Holdings* conclusion, it is apparent that to the extent Sovereign's bonds are West German, they must be validated.  *See id.*; *see also Mortimer*, 615 F.3d at 117; *Kupfer*, 2011 WL 1672741, at *3–4.

Case No. 10-21944-CIV-ALTONAGA/Simonton

Sovereign purchased its bonds "with full knowledge of these treaty obligations and the resulting risk [it] was undertaking." *Teplin v. Fed. Rep. of Ger.*, No. 81-1874, 1982 U.S. App. LEXIS 12629, at *3 (D.C. Cir. Aug. 18, 1982). While it may still obtain payment on the bonds, it must first apply in Germany for validation. Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Plaintiff's Amended Complaint **[ECF No. 118]** is **GRANTED.**

2. Plaintiff may file an Amended Complaint on or before **July 28, 2011** if it is able, within the limitations of Rule 11, to assert its bonds were validated. If no amended pleading is filed by July 28, 2011, or if Plaintiff advises it will not amend, the case shall be dismissed without prejudice as to Germany.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of July, 2011.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

Case No. 10-21944-CIV-ALTONAGA/Simonton

Fig. 1

Neither the plaintiff in *Mortimer* nor Sovereign has "filled in" the missing arrow — demonstrating a liability link from provincial bonds issued in territories that became East Germany to East Germany itself, to Germany. In other words, if East Germany never assumed liability for the provincial bonds issued within the lands that later comprised it (i.e., no arrow), then, even when upon reunification Germany affirmatively assumed East German debt and liability, Germany did not assume pre-East German debt and liability that East Germany did not itself assume (no "circles"). That is, of course, unless Germany took some other affirmative step to assume that liability (e.g., an arrow from the first box directly to the third). This "other" affirmative step is the gap neither Mortimer nor Sovereign has filled.



20